**Dr. Norman Asa GARRISON, Jr., Petitioner,**

v.

**Kenneth SMITH, Sheriff, in Succession to Johnny Taylor, Respondent.**

**No. WC 76–33–K.**

United States District Court, N. D. Mississippi, W. D.

April 30, 1976.

John B. Farese, Ashland, Miss., Kay Farese Luckett, Clarksdale, Miss., John Booth Farese, Ashland, Miss., for petitioner.

Edwin A. Snyder, Eupora, Miss., for respondent.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is a habeas corpus proceeding brought pursuant to 28 U.S.C. § 2241 et seq., by Dr. Norman A. Garrison, Jr., petitioner, a resident of Corinth, Mississippi, in which he seeks release from custody of the Sheriff of Marshall County, Mississippi, based upon a warrant of extradition rendered December 4, 1974, by the Governor of the State of Mississippi. If executed, the warrant would return Garrison to the State of Missouri, whose governor has requested his extradition as the accused on a charge of first degree murder of Garrison's former wife, Lee Ann Garrison, at Kennett, Dunklin County, Missouri.

This case had its genesis on September 8, 1974, when the body of Lee Ann Garrison was discovered in her Kennett, Missouri, home about 11:20 a. m. In addition to having sustained a brutal beating, the victim had been fatally shot in the head with a small caliber pistol. Local law enforcement officials arrived on the scene soon after discovery of the body and began their investigation. Later that afternoon or evening Charles H. Baker, prosecuting attorney of Dunklin County, filed an affidavit before Leon McAnally, judge of the Magistrate Court of Dunklin County, charging Garrison with the murder. Judge McAnally forthwith issued a warrant for petitioner's arrest.

When Garrison could not be found in Missouri, and his presence in Mississippi became known, Christopher S. Bond, Governor of Missouri, on September 18 upon the petition of the Dunklin County prosecuting attorney requested Garrison's extradition from William L. Waller, Governor of Mississippi. Extradition proceedings were commenced, and on October 10 a hearing was held before Governor Waller's extradition officer to determine whether Garrison should be returned to Missouri. On December 4, Governor Waller signed the warrant of rendition, and petitioner immediately surrendered to the Marshall County sheriff. On the same day, Garrison's attorneys petitioned the Circuit Court of Marshall County for a writ of habeas corpus; the writ was promptly issued, made returnable December 18, and bail set at $25,000.

At the request of the Attorney General of Mississippi, who undertook representation of both the respondent sheriff and the interests of the State of Missouri, the state court habeas corpus hearing was continued until January 6, 1975. After an exhaustive three-day evidentiary hearing in state court, the trial judge suppressed the warrant of extradition, sustained the petition for habeas corpus and discharged Garrison from custody.

Respondent appealed to the Supreme Court of Mississippi, which on March 23, 1976, reversed the judgment of the trial court, quashed the writ of habeas corpus and ordered that Garrison be remanded to the sheriff of Marshall County for return to Missouri. Garrison's petition for rehearing in the state supreme court was denied on April 20 and, eschewing appeal or petition for certiorari to the Supreme Court of the United States, petitioner that same day entered this federal district court seeking habeas relief for alleged violations of his federal rights.

Since the mandate of the state supreme court had already issued, we immediately ordered the issuance of a writ of habeas corpus to preserve the status quo and afford Garrison the opportunity to present his claims to this court. Our writ, issued on April 20, was made returnable April 26, and $100,000 bail was set and at once posted by petitioner.

On April 26, at our hearing, the parties agreed that a full and fair evidentiary hearing had been conducted by the state courts. No contention was made that either 28 U.S.C. § 2254(d) or *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), mandated an evidentiary hearing in this court. The entire state court record, together with briefs and other legal memoranda submitted to the state supreme court, was received into evidence. The parties stipulated that the state record was full and complete, requiring no additional proof save

in one particular. Petitioner offered the official documents received by the Mississippi Governor in support of the Missouri extradition request. This exhibit was received over respondent's objections.[1]

We have now given full consideration to the state court proceedings, the briefs of counsel and the oral arguments made to this court, and can proceed to a ruling on Garrison's petition for a writ of habeas corpus.

▇▇▇ Our jurisdiction here is properly laid under 28 U.S.C. § 2241, and Garrison has by resort to the Circuit Court of Marshall County and the Supreme Court of Mississippi sufficiently exhausted his state court remedies, thus meeting the requirements of 28 U.S.C. § 2254. See *Sweeney v. Woodall,* 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114 (1953); *Lizana v. Alabama,* 394 F.2d 512 (5 Cir.1968); *Walden v. Mosley,* 312 F.Supp. 855 (N.D.Miss.1970). Likewise, though presently released on bond, petitioner is "in custody" within the meaning of § 2254, and therefore not ineligible for habeas corpus relief. See *Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Marden v. Purdy,* 409 F.2d 784 (5 Cir.1969).

Petitioner's arguments before this court are substantially identical to those presented at every level of the state court proceedings and constitute a two-pronged attack upon the validity of his extradition. It is first contended that extradition is improper in the absence of probable cause to support the issuance of the original arrest warrant and extradition request by the State of Missouri. Petitioner further argues that he was demonstrably not within the demanding state at the time of the commission of the alleged crime, and is thus incapable of

being a fugitive within the meaning of applicable constitutional and statutory provisions.

Respondent's position is that an inquiry into the probable cause upon which the Missouri accusatory affidavit, arrest warrant and extradition request were based is not for this court to undertake, since petitioner's constitutional claims are appropriately to be raised in the demanding state, and if necessary in the federal courts of Missouri, not in the state or federal courts of Mississippi, the state of his asylum. The respondent also argues that petitioner has failed to carry his burden of establishing conclusively his absence from the State of Missouri at the time of the commission of the alleged crime, and therefore must be considered a fugitive from Missouri justice.

## GENERAL PRINCIPLES OF EXTRADITION

Interstate extradition of fugitives is a matter of federal law, originating in article IV, section 2 of the United States Constitution:

"A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

Effectuation of this constitutional mandate has been at all times assured by federal extradition statutes which date to 1793. See Act of Feb. 12, 1793, 1 Stat. 302; *Ex parte Kentucky v. Dennison,* 65 U.S. 66, 16 L.Ed. 717 (1861). The current congressional implementing statute is 18 U.S.C. § 3182.[2]

---

1. The ground of the objection was that petitioner, by failing to offer the documents in the state habeas proceeding, deliberately bypassed any state remedy relating to the sufficiency of the documents. This objection was overruled. Though it is anomalous that petitioner did not offer the extradition request and supporting documents before the state court to test their facial sufficiency, he nevertheless sought from the outset of the state court proceedings to suppress these documents on Fourth Amend-

ment grounds, thus preserving the issue of lack of probable cause for his arrest.

2. "Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having

The concept of national extradition manifested in these constitutional and statutory provisions was clearly expressed in a statement of continuing validity by the Supreme Court in *Biddinger v. Commissioner of Police,* 245 U.S. 128, 132–33, 38 S.Ct. 41, 42, 62 L.Ed. 193, 198 (1917):

"The provision of the federal Constitution quoted . . . was not used to express the law of extradition as usually prevailing among independent nations, but to provide a summary executive proceeding by the use of which the closely associated states of the Union could promptly aid one another in bringing to trial persons accused of crime by preventing their finding in one state an asylum against the processes of justice of another. . . . Such a provision was necessary to prevent the very general requirement of the state constitutions that persons accused of crime shall be tried in the county or district in which the crime shall have been committed from becoming a shield for the guilty rather than the defense for the innocent, which it was intended to be. Its design was and is, in effect, to eliminate, for this purpose, the boundaries of states, so that each may reach out and bring to speedy trial offenders against its laws from any part of the land.

"Such being the origin and purpose of these provisions of the Constitution and statutes, they have not been construed narrowly and technically by the courts as if they were penal laws, but liberally, to effect their important purpose, with the result that one who leaves the demanding state before prosecution is anticipated or begun, or without knowledge on his part that he has violated any law, or who, having committed a crime in one state, returns to his home in another, is nevertheless decided to be a fugitive from justice within their meaning. . . .

"Courts have been free to give this meaning to the Constitution and statutes because, in delivering up an accused person to the authorities of a sister state, they are not sending him for trial to an alien jurisdiction, with laws which our standards might condemn, but are simply returning him to be tried, still under the protection of the federal Constitution, but in the manner provided by the state against the laws of which it is charged that he has offended." (Citations of authority omitted).

■ Thus, extradition is intended not as a preliminary inquiry into the merits of a criminal prosecution, but merely as a summary executive proceeding by which a criminal accused can be brought before the appropriate tribunal for adjudication. Our role in this case is therefore exceedingly narrow, and it is well settled in this and other circuits that as a federal district court sitting in the asylum state, our duty is confined to three rigidly defined points of inquiry:

(1) whether a crime has been "charged" in the demanding state;

(2) whether the individual in custody is the person so charged; and

(3) whether the individual in custody was in the demanding state when the alleged crime was committed.

*Hyatt v. People of State of New York ex rel. Corkran,* 188 U.S. 691, 709, 23 S.Ct. 456, 458, 47 L.Ed. 657, 658 (1903); *U. S. v. Henderson,* 453 F.2d 790 (5 Cir.1971); *Watson v. Montgomery,* 431 F.2d 1083 (5 Cir. 1970); *Woods v. Cronvich,* 396 F.2d 142 (5 Cir.1968); *U. S. v. Flood,* 374 F.2d 554 (2 Cir.1967); *Smith v. State of Idaho,* 373 F.2d 149 (9 Cir.1967); *Walden v. Mosley,* 312 F.Supp. 855 (N.D.Miss.1970).

■ Implicit in this notion of limited inquiry by asylum state courts in extradition proceedings is the now axiomatic rule that

committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and

notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of arrest, the prisoner may be discharged."

state and federal courts and executive officers in the asylum state are not otherwise to concern themselves with the legality of the criminal prosecution pending against the fugitive in the demanding state. *Sweeney v. Woodall,* 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114 (1952); see *Watson v. Montgomery,* supra; *Woods v. Cronvick,* supra; *U. S. v. Flood,* supra; *Davis v. Behagen,* 321 F.Supp. 1216 (S.D.N.Y.1970). Against this general background we measure petitioner's precise contentions.

## THE SUFFICIENCY OF THE CHARGE AND PROBABLE CAUSE

 Since Garrison raises no issue that he is not the person sought by Missouri authorities, we may begin by determining whether petitioner has been charged with crime in Missouri within the meaning of § 3182 and the Extradition Clause of the Constitution. As to the form of the request for extradition, the rendition warrant and supporting documents, there is no dispute. All have been properly executed by authorized officials of both states. The complaint or accusatory affidavit charging petitioner with crime was executed in accordance with Missouri law,[3] and the subsequent arrest warrant for the crime of first degree murder issued by Judge McAnally likewise is in proper form. See V.A.M.S. § 544.020 (1969); Missouri Supreme Court Criminal Rule 21.08; *State v. Eaton,* 504 S.W.2d 12 (Mo.1973). There can be no question that petitioner has been charged with commission of a felony by the State of Missouri; this appears conclusively as a matter of law on the face of the pertinent documents. *Pierce v. Creecy,* 210 U.S. 387, 28 S.Ct. 714, 52 L.Ed. 1113 (1907); *Appleyard v. Massachusetts,* 203 U.S. 222, 27 S.Ct. 122, 51 L.Ed. 161 (1906); *Munsey v. Clough,* 196 U.S. 364, 25 S.Ct. 282, 49 L.Ed. 515 (1905); *Hyatt v. New York,* 188 U.S. 691, 23 S.Ct. 456, 47 L.Ed. 657 (1902).

Petitioner's chief attack on the sufficiency of the criminal charge against him is directed not at the technical form of the charge but at the evidentiary facts on which the charge was made. Garrison's contention is that courts in the asylum state must initially determine whether the demanding state's charge of crime and request for extradition have been supported by probable cause for petitioner's arrest. Petitioner views the Fourth Amendment to require probable cause for arrest in extradition proceedings no less than in other cases and argues that he may assert this constitutional claim in the courts of the asylum state as a defense against extradition.

 Of course it needs no citation to conclude that arrests performed without probable cause are violative of the Fourth Amendment. But the question before us is not *whether* the probable cause defense may be raised to vitiate an arrest but when and before which tribunal. The traditionally summary nature of extradition and the awareness that our Constitution protects equally citizens throughout the United States has led to the well-established rule already mentioned that it is not for courts in the asylum state to inquire into the constitutionality of a sister state's criminal justice system. Thus, it has been widely held in state and federal courts that courts in the asylum state are not to question whether the warrant for a fugitive's arrest is supported by probable cause. As held by the Second Circuit, courts in the asylum state are not to "pass upon the quality, persuasiveness or weight of the evidential matter on the basis of which the Governor of [the demanding state] issued the extradition warrant. . . ." *U. S. v. Flood,* 374 F.2d 554, 556 (1967). Accord, *Watson v. Montgomery,* 431 F.2d 1083 (5 Cir.1970); *Woods v. Cronvich,* 396 F.2d 142 (5 Cir.

---

**3.** Article 1, section 17 of the Constitution of Missouri of 1945 permits felony prosecutions to proceed either by grand jury indictment or bill of information. Thus, before petitioner may be finally brought to trial in the Missouri courts, an indictment or information must yet be filed against him. It is clear, however, that the accusatory affidavit presented to a magistrate forms a crucial first step in the prosecution, and petitioner has nonetheless been charged with crime under § 3182 even though a step remains to be taken before trial. *In re Strauss,* 197 U.S. 324, 25 S.Ct. 535, 49 L.Ed. 774 (1905); *State v. Eaton,* 504 S.W.2d 12 (Mo.1973).

1968); *Davis v. Behagen,* 321 F.Supp. 1216 (S.D.N.Y.1970); *Taylor v. Garrison,* 329 So.2d 506 (Miss.1976); *In re Ierardi,* 321 N.E.2d 921 (Mass.1975); *Bailey v. Cox,* 260 Ind. 448, 296 N.E.2d 422 (1973); *People v. Woods,* 52 Ill.2d 48, 284 N.E.2d 286 (1972). The rationale of these holdings is that the constitutional rights of the accused are sure to be safeguarded by the state and federal courts of the demanding jurisdiction.

Petitioner places his main reliance on *Kirkland v. Preston,* 128 U.S.App.D.C. 148, 385 F.2d 670 (1967), which construed § 3182 in the light of the Fourth Amendment to mean "that, for purposes of extradition, the Section 3182 'affidavit' does not succeed in 'charging' a crime unless it sets out facts which justify a Fourth Amendment finding of probable cause." 385 F.2d at 674. The *Kirkland* court concluded that the Fourth

Amendment having now been made fully effective on the states,[4] and since an arrest under § 3182 is in every respect a criminal arrest, no reason appears why Fourth Amendment safeguards should not apply in extradition proceedings, at least where, as in *Kirkland,* the charge of crime in the demanding state has been made by affidavit and not by grand jury indictment.

Hailing *Kirkland* as the progenitor of a "growing body of law" requiring an affirmative showing of probable cause for arrest by the demanding state before extradition may be accomplished, petitioner urges that both the accusatory affidavit as well as the Missouri arrest warrant issued in reliance on it are fatally deficient in that they fail to establish probable cause for his arrest consistent with Fourth Amendment requirements.[5] To be sure, *Kirkland's* prin-

4. See *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

5. The verified affidavit, styled "Affidavit or Complaint in Felony Case," made by Charles Baker, prosecuting attorney of Dunklin County, Missouri, reads as follows:

"Charles H. Baker, being duly sworn, deposes and states that at the County of Dunklin and State of Missouri, heretofore, to-wit: On or about the 8th day of September 1974, one Norman Asa Garrison, Jr. did then and there wilfully, unlawfully, and feloniously, premeditatedly, deliberately, and of malice aforethought did make an assault upon one Lee Ann Garrison with a loaded firearm, and then and there, feloniously, wilfully, premeditatedly, deliberately, and of his malice aforethought did discharge and shoot said firearm at and upon the body of the said Lee Ann Garrison thereby feloniously inflicting a mortal wound upon the said Lee Ann Garrison, from which mortal wound the said Lee Ann Garrison did die on the 8th day of September, 1974 contrary to the form of statute in such case made and provided, and against the peace and dignity of the State of Missouri."

Judge McAnally, Magistrate of Dunklin County, utilizing Missouri Supreme Court Form No. 21, then issued a Warrant for Arrest to any peace officer in the State of Missouri in the following form:

"You are hereby commanded to arrest Norman Asa Garrison, Jr. who is charged with the crime of first degree murder in that on or about the 8th day of September, 1974 in Dunklin County, Missouri he did then and there wilfully, unlawfully and feloniously premeditatedly,

deliberately, and of malice aforethought did make an assault upon one Lee Ann Garrison with a loaded firearm, and then and there, feloniously, wilfully, premeditatedly, deliberately, and of his malice aforethought did discharge and shoot said firearm at and upon the body of the said Lee Ann Garrison thereby feloniously inflicting a mortal wound upon the said Lee Ann Garrison, from which mortal wound the said Lee Ann Garrison did die on the 8th day of September, 1974 alleged to have been committed within the jurisdiction of this court and in violation of the laws of the State of Missouri, and to bring him forthwith before this court to be here dealt with in accordance with law; and you, the officer serving this warrant, shall forthwith make return hereof to this court."

Appended to the requisition papers are two sections of the Missouri statutes, reading as follows:

"V.A.M.S. *§ 559.010. Murder in the first degree.*—Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree."

"V.A.M.S. *§ 559.030. Trials for murder, verdict and punishment.*—Upon the trial of an indictment for murder in the first degree, the jury must inquire, and by their verdict ascertain, under the instructions of the court, whether the defendant be guilty of murder in the first or second degree; and persons convicted of murder in the first degree shall suffer death, or be punished by imprisonment in the

ciple appears to have been followed by the Third Circuit, *United States ex rel. Grano v. Anderson,* 446 F.2d 272 (1971), aff'd, 318 F.Supp. 263 (D.Del.1970), and may have made marginal headway in some state courts,[6] but it is fair to say that in this circuit and throughout the majority of state and federal courts, the rule remains, as before, that constitutional claims and defenses are to be raised by fugitives upon their return to the demanding state, and not before.

■ Indeed, several state jurisdictions which have had occasion to consider the probable cause requirement as imposed by *Kirkland* have rejected it outright. *Garrison v. Taylor,* 329 So.2d 506 (Miss.1976); *In re Ierardi,* 321 N.E.2d 921 (Mass.1975); *Bailey v. Cox,* 296 N.E.2d 422 (Ind.1973); *People v. Woods,* 52 Ill.2d 48, 284 N.E.2d 286 (1972); *Smith v. State,* 89 Idaho 70, 403 P.2d 221 (1966); *Koprivich v. Warden,* 234 Md. 465, 200 A.2d 49 (1963). In the federal system, a number of courts have considered whether other basic constitutional protections guaranteed the criminal accused may be properly asserted in asylum state extradition proceedings. *Watson v. Montgomery,* 431 F.2d 1083, 1087 (5 Cir.1970); *Woods v. Cronvich,* 396 F.2d 142 (5 Cir.1968), and *Davis v. Behagen,* 321 F.Supp. 1216 (S.D.N.Y.1970). The decisions of these courts are unmistakably clear that courts in the asylum state may not question the existence of probable cause or other constitutional defects in a demanding state's indictment. The Second Circuit specifically refused to inquire into probable cause when the extradition request was predicated upon an information, rather than an indictment, *U. S. v. Flood,* 374 F.2d 554, 556 (2 Cir.1967). We also know that constitutional claims based

on the Fifth[7] and Eighth[8] Amendments or on the Double Jeopardy Clause[9] may not be presented to asylum state tribunals, but may only be raised upon return to the demanding state. The Supreme Court has itself applied this concept to defenses based on the running of the statute of limitations.[10]

Petitioner argues that *Kirkland* has received recent, and conclusive, support from *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and *Ierardi v. Gunter,* 528 F.2d 929 (1 Cir.1976). On the contrary, these cases cut the other way, and reinforce our judicial reluctance, as a court in the asylum state, to inquire into the probable cause upon which the Missouri arrest warrant and extradition request were based.

In *Gerstein,* which was not an extradition case, the Supreme Court held "that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint on liberty following arrest." 420 U.S. at 114, 95 S.Ct. at 860, 43 L.Ed.2d at 65. In defining the content of this antecedent determination, the Court was careful to point out that "[a] person arrested under a warrant would have received a prior judicial determination of probable cause." 420 U.S. at 116, n. 18, 95 S.Ct. at 864, 43 L.Ed.2d at 67.

In *Ierardi,* the First Circuit read "*Gerstein* [as requiring] a judicial determination of probable cause as a prerequisite to interstate extradition." 528 F.2d at 930. Having thus imported the Fourth Amendment into extradition proceedings,, the *Ierardi* court stopped short of the plenary probable cause determination required by *Kirkland:*

"Respondents seem to assume that if a judicial determination of probable cause must precede extradition, it must be pro-

---

penitentiary during their natural lives; those convicted of murder in the second degree shall be punished by imprisonment in the penitentiary not less than ten years.

6. *Pippin v. Leach,* 534 P.2d 1193 (Colo.1975); *Brode v. Power,* 31 Conn.Sup. 412, 332 A.2d 376 (1974) (construing state law); *Sheriff v. Thompson,* 452 P.2d 911 (Nev.1969) (construing state law); *People v. Artis,* 32 App.Div.2d 554, 300 N.Y.S.2d 208 (1969).

7. *U. S. v. Flood,* 374 F.2d 554, 557 (2 Cir.1967).

8. *Sweeney v. Woodall,* 344 U.S. 86, 88–90, 73 S.Ct. 139, 140, 97 L.Ed. 114, 115 (1953).

9. *U. S. ex rel. Tyler v. Henderson,* 453 F.2d 790 (5 Cir.1971).

10. *Biddinger v. Commissioner of Police,* 245 U.S. 128, 38 S.Ct. 41, 62 L.Ed. 193 (1917).

vided by the courts of the asylum state, where the fugitive is held. This is not so. *Gerstein* explicitly rejected the need for adversarial procedures; it required only the neutral and detached judgment of a judicial officer or tribunal, and contemplated that this could be provided before as well as shortly after arrest. Thus nothing in *Gerstein* prevents the demanding state from providing the requisite pre-rendition determination of probable cause." 528 F.2d at 930–31.

*Ierardi* harmonizes Fourth Amendment demands with the requirements of the Extradition Clause and § 3182 by holding that once a pre-extradition probable cause determination has been made by the demanding state, the asylum state is not required "to find probable cause anew, nor would it need to review the adequacy of the [demanding state's] determination. Instead, it would be entitled to rely on the official representations of its sister state that the requisite determination had been made. . . ." 528 F.2d at 931.

■■■■■ Thus, even assuming, without deciding, that Fourth Amendment claims may be at all raised in the asylum state by the accused in extradition proceedings, Garrison's claim must fail here, since the State of Missouri has found probable cause for his arrest through the issuance of an arrest warrant by a disinterested judicial officer whose duty it is to make an a priori determination of probable cause.[11]

■■■ In short, we cannot accept *Kirkland's* interpretation that an extradition request based on an accusatory affidavit, along with an arrest warrant issued by a judicial officer, cannot be honored under § 3182 unless the charging documents set out facts which support an independent finding of probable cause satisfactory to asylum state courts. Neither can we believe that such an interpretation will be hospitably received by either the Fifth Circuit or the Supreme Court of the United States. Not only has this circuit consistently refused to allow consideration of any constitutional objections in the asylum state, limiting the pertinent inquiry to the three delineated issues we have already discussed, but adoption of the *Kirkland* rationale would, we fear, inevitably frustrate the purpose of the Extradition Clause and § 3182 by forcing protracted litigation in the asylum state of a host of constitutional questions which would then be litigated afresh in the demanding state.[12] Not only would these be issues which "should be tested in the courts of the demanding state, where all the parties may be heard, where all pertinent testimony will be readily available, and where suitable relief, if any, may be fashioned," *U. S. v. Henderson,* supra at 793, but an intrusive determination by asylum state courts would do violence to essential principles of our federalism. As one court has tartly put it, in a statement expressly approved by the Fifth Circuit, *Watson v. Montgomery, supra,* at 1087:

> "There is an established procedure for the correction of error or dereliction on the part of every court in the country,

11. In Missouri, of course, judges of the magistrate courts are judicial officers, and there, as elsewhere, issuance of an arrest warrant is a judicial act which implies that a finding of probable cause for arrest has been made. See *State v. Stevens,* 316 Mo. 602, 292 S.W. 36 (1927); *State v. Halbrook,* 279 S.W. 395 (Mo. 1925); Missouri Supreme Court Rule 21.08. Though we express no opinion on the correctness of the magistrate's determination, that such a determination was made is not open to doubt.

12. If Fourth Amendment issues may be raised in the asylum state, it logically follows that the criminal accused ought also to be able to present all other constitutional defenses initial-

ly to asylum state courts. In the instant case, for example, petitioner may well wish to argue that certain facts mentioned in any probable cause affidavit are based on evidence illegally obtained by Missouri authorities in violation of his Fourth and Fifth Amendment rights. Should Mississippi courts then be required to conduct suppression hearings? If proceeded against by an indictment, any fugitive may wish to question whether blacks have been systematically excluded from the grand jury which indicted him. It requires scant imagination to multiply diverse claims of constitutional proportion which would intolerably burden habeas corpus courts, both state and federal, in the state of the fugitive's asylum.

and where constitutional rights are involved the Supreme Court of the United States stands watchman over every court, state or federal. It would be an act of unwarranted arrogance for us to ascribe to ourselves virtue superior to that of other courts and so to assert power to hear and determine the faithfulness to duty of a sister court occupying a place like ours in the federal system." *Johnson v. Matthews,* 86 U.S.App.D.C. 376, 182 F.2d 677 (1950).

We hold that in the case sub judice the documents supporting the request for extradition by the Missouri authorities foreclose any inquiry by us into Garrison's claims of Fourth Amendment violation.

### PRESENCE IN THE DEMANDING STATE

As petitioner acknowledges, once a warrant of rendition has been issued by the governor of the asylum state, the burden is upon the fugitive to show "by clear and satisfactory evidence that he was outside the limits of [the demanding state] at the time of the homicide. Stated otherwise, he should not [be] released unless it appear[s] beyond reasonable doubt that he was outside [the demanding state] when the alleged offense was committed and, consequently, could not be a fugitive from her justice." *South Carolina v. Bailey,* 289 U.S. 412, 421–22, 53 S.Ct. 667, 671, 77 L.Ed. 1292, 1297 (1933). Petitioner takes no issue with the *Bailey* rule, which has been since followed without substantial variation by federal courts at all levels, including the Fifth Circuit, *Watson v. Montgomery,* 431 F.2d 1083 (1970), and this court, *Walden v. Mosley,* 312 F.Supp. 855 (N.D.Miss.1970). To meet this heavy burden, Garrison must conclusively establish his absence from Missouri at the time of the alleged offense by clear and convincing proof. Consequently, wherever there is contradictory evidence of a substantial nature directed to the question of presence in or absence from the state in which the alleged offense was committed, "habeas corpus is not the proper

proceeding to try the question of alibi, or any question as to the guilt or innocence of the accused." *Munsey v. Clough,* 196 U.S. 364, 375, 25 S.Ct. 282, 285, 49 L.Ed. 515, 518 (1905). Though recognizing the controlling effect of *Bailey,* the state habeas trial judge viewed the record as free from material conflict, while the Supreme Court of Mississippi reached the opposite conclusion. The latter court determined that the total evidence presented in the trial court did raise substantial issues of credibility and therefore of fact whether Garrison had established clearly and convincingly that he was not present within the State of Missouri at the time of the alleged offense. We have carefully and maturely considered the entire record on which the trial judge and the state supreme court were in sharp disagreement on this vital question.[13] We conclude that the trial judge reached an erroneous legal conclusion in that he undertook to weigh and determine conflicting issues of material fact and, contrary to the *Bailey* rule, resolved the evidence in favor of Garrison. This error was, we think, properly reversed on appeal.

It would unduly prolong this opinion to review all evidence submitted at the protracted state court habeas hearing, and it will suffice for us to highlight the areas of material conflict since, in our judgment, "[t]he record presents an irreconcilable conflict of evidence. It is not possible to say with certainty where the truth lies." *Bailey,* supra, 289 U.S. at 419, 53 S.Ct. at 670, 77 L.Ed. at 1295.

Dr. Garrison, a physician 32 years of age at the time of the state habeas proceeding, married Lee Ann Wilson on August 17, 1963 (R. 144–45), and after completing his medical training entered practice at Kennett, Missouri, with his father-in-law, Dr. Lawrence Wilson. He resided in that city with Mrs. Garrison from June 1970 until January 1974 (R. 146). Thereafter a divorce was obtained and the petitioner returned to Corinth, Mississippi, his home town, to continue his medical practice (R. 147). There

---

**13.** All subsequent references relate to the state court record.

were three children of the marriage who, at the time of the habeas hearing, were 10, 5 and 3 years of age (R. 146). Garrison testified that he was last in Kennett on June 1, 1974 (R. 150), and that his blood type was O-positive (R. 181).

As to his whereabouts at the time of his former wife's death, Garrison testified that after making his hospital rounds on Saturday, September 7, 1974, he went to National Guard drill at Jackson, Tennessee, where he remained until 2:30 p. m. After stopping at Guys, Tennessee, he returned to Corinth where he checked his mail and made plans to go to a houseboat owned by Ronald Windsor, his long-time friend and personal attorney; this houseboat was moored at the State Line Boat Dock, 35 miles from Corinth on Pickwick Lake (R. 147). He drove from Corinth to the lake, arriving at approximately 8 p. m., and was there met by Windsor and Linda Sweat, who was Dr. Garrison's receptionist (R. 148, 259). Garrison drank one beer, took a sleeping pill and went to sleep about 9 p. m. on the top bunk of the houseboat bedroom (R. 148). Garrison stated that the small houseboat consisted of a front room with a kitchenette, table and couch, an intervening bath and closet, and two bunks in a single bedroom, and that while sleeping, his head was to the front of the boat, not more than 2 feet away from the front room (R. 148–49). He awoke the next morning at approximately 7 o'clock, saw Windsor asleep in the lower bunk and Linda Sweat asleep on the couch in the front room, got a glass of water and saw "Putt" Hamblin, a long-time friend and patient, come aboard the houseboat seeking medicine for stomach nausea (R. 149–50). As will be later seen, Garrison's crucial alibi witnesses are Windsor, Sweat, and Hamblin.

Later that morning, which was Sunday, between approximately 9:30 and noon, Garrison was seen by various witnesses in or about the boat dock area (R. 152, 158–160). After leaving Pickwick Lake at 2:30 p. m., he spent the remainder of the day in the Corinth area (R. 160–62). On the next day, Monday, September 9, he was fingerprinted at Corinth by F.B.I. agents (R. 165).

On cross-examination, Garrison acknowledged that following his divorce a petition was filed against him in the Chancery Court of Alcorn County on July 25, 1974, for failure to abide by the terms of the Missouri court divorce decree, which related to the return of the three children who had been in his custody during the summer months (R. 170–71). Approximately a month later, he stated he enrolled his oldest child in school at Corinth, but to avoid further litigation agreed for his ex-wife to come to Corinth and pick up the children on September 13, 1974 (R. 172).

Garrison stated that in the National Guard he was attached to a medical unit as battalion surgeon, that he changed into his uniform at the guard meeting at Jackson, Tennessee, leaving his civilian clothing at the National Guard Armory upon his departure (R. 173, 174). Upon leaving guard duty, he was unable to recall telling two medical assistants, Russell Childers and Ronnie Smith, that he would be late in arriving for National Guard duty on Sunday, September 8, because of surgery scheduled at the Corinth hospital (R. 188). Childers stated that before leaving drill duty on September 7, Garrison told him "he had surgery the next morning but he thought without complications he would be there in plenty of time" to give the symptomology class scheduled to take place at 1 p.m. (R. 549). Ronnie Smith testified to the same effect (R. 561).

Linda Sweat stated that Windsor picked her up at her apartment in Corinth at approximately 6 p. m. on September 7, and that they went directly to Ronald's houseboat, arriving at approximately 7 p. m., where Garrison appeared "about 8:00 or 8:30" (R. 255–257, 252). Linda stated that she, Ronald and Garrison sat around for awhile talking and Garrison went to bed "somewhere around 9:00" p. m. (R. 252). Linda next saw Garrison about 7 the following morning when she heard him talking to Hamblin (R. 253). On cross-examination, Miss Sweat stated that she and Wind-

sor arrived at the houseboat about 7 p. m. with Garrison coming shortly thereafter, or about 8 o'clock (R. 256); that at the time of the habeas hearing Miss Sweat, who worked for Garrison as his receptionist, was living in a house at Corinth owned by Windsor for which she paid no rent (R. 259–61). Miss Sweat testified that she remained awake aboard the houseboat until about 11 p. m., during which time Pam and Mike Miller, friends and also residents of Corinth, arrived (R. 262). After the Millers' arrival, cooking on the grill took place at the front end of the boat while Mike drank liquor and Windsor drank beer (R. 265–71). Also according to Linda, Pam Miller came inside, seated herself at the table, no more than a couple feet away from the top bunk in which Garrison was asleep (R. 263), that Pam had her tape player operating, and that after barbequing the meat, Windsor and Mike Miller came inside and the four of them sat at the table to dine (R. 263–264). The Millers remained aboard until 11 p. m. and apparently were unaware of the presence of Garrison, asleep on the top bunk (R. 265–71). Miss Sweat was positive that the Millers arrived at around 8 p. m., though she is equally certain that this was after Garrison had retired to the top bunk, which she fixed at 9 p. m. (R. 265–72).[14]

Ronald Windsor, presently serving as prosecuting attorney for Alcorn County, stated that he first saw Garrison on September 7 at about 5 p. m. at Guys, Tennessee, where he invited Garrison to a cookout on his houseboat that evening at Pickwick Lake where Garrison might come to "get a good night's sleep." Windsor also offered Garrison the use of Windsor's housetrailer, where he would be alone (R. 277–78). He stated that Garrison came aboard the houseboat shortly after he and Miss Sweat arrived there, and that Garrison went to bed about 9 p. m., but before the two other guests, Mike and Pam Miller, came for the cookout (R. 278–79). The Millers remained aboard the vessel for a couple of hours, leaving about 11 p. m. (R. 280). Windsor said that he went to bed about 11 p. m., taking the lower bunk, then seeing Garrison asleep in the upper bunk. During the night Windsor said he was up several times looking for medicine for a sore throat and saw Garrison asleep on the bunk at approximately 1 a. m. and again at about 3 a. m. (R. 281–83). Windsor affirmed that Miss Sweat slept on the couch in the front room of the houseboat (R. 283), and that he saw both Garrison and Miss Sweat at approximately 7:30 on the morning of September 8 (R. 283–84).

On cross-examination Windsor stated that he had known Garrison since their junior high school days, that he was drinking beer both while he was at the Old Hickory Grill at Guys, Tennessee, and later at the houseboat (R. 294, 297). Windsor explained that his houseboat was about 30 feet long and 8 feet wide, including the front, or exposed part of the boat, where cooking was done on the grill (R. 298); that the hallway leading from the front room where the table and couch were located was about 3 feet wide, and that anyone walking down the hallway would, upon entering the bedroom, come very close to the top bunk (R. 298–99). Windsor stated that Garrison mentioned nothing to him about any surgery cases for Sunday morning, September 8, but merely expressed interest in getting "a good night's sleep." Windsor affirmed that he offered Garrison the use of his housetrailer where he could be alone but was unaware that Garrison also had a room rented in his name at a local Corinth motel at that time (R. 183–85, 305).

Garrison, who then made his home with his mother at Corinth, stated that he had rented a room at the Corinth Holiday Inn from September 1–10 , 1974 (R. 183), but this room was vacant on the night of Sep-

---

14. At the habeas hearing neither Mike Miller nor Pam Miller were offered in support of Garrison's alibi. At our habeas hearing, petitioner sought to offer an ex parte affidavit of Pam Miller which was excluded. If consideration were given to this affidavit it would be noted that Mrs. Miller stated that she went to the bathroom while on the boat, and in the darkened hallway she noticed "an object of some kind on the top bunk" but that she did not realize it was Garrison or indeed a human being.

tember 7 (R. 185). Garrison's explanation was that the room was rented for "a friend of mine that came down to see me from Missouri and also frequently I rented rooms when I had an obstetric patient in labor, and I stayed there." (R. 184).

The remaining crucial alibi witness, Ronald Neil Hamblin, also known as "Putt", was a local factory worker 23 years of age. He testified (R. 315–325) that on the morning of September 8 he left his girlfriend's apartment in Corinth about 6:30 a. m., drove approximately 35 miles to the State Line Boat Dock, arriving there about 7 a. m. for the purpose of getting medicine from Garrison, whom he knew to be aboard Windsor's houseboat. Hamblin said he suffered from stomach trouble for which Garrison was treating him, that he had been told in advance Garrison would be at a cookout aboard Windsor's houseboat "any time everybody got there" on Sunday, September 8 (R. 319), and upon his arrival Garrison gave him pills for his ailment. Hamblin admitted that Garrison gave him medical treatment without charge and that they were good friends (R. 325).

Teralane Veazey, about 12 years of age, the daughter of Dr. and Mrs. Joe G. Veazey, Jr., testified that she and her parents arrived at Pickwick Lake to enter their houseboat at approximately 8 p. m. on September 7 (R. 310); that she passed by and saw four people cooking steaks on the Windsor houseboat (R. 311); that Sunday morning, September 8, she saw Garrison in front of the Windsor houseboat between 9 and 9:30 a. m. (R. 311). On cross-examination she stated the first time she saw Garrison in the vicinity of the houseboat was at sometime after 9 o'clock in the morning (R. 314).

On September 10, Garrison was physically examined by a physician and others, and no evidence of injury of any kind was found upon Garrison's person (R. 234, 241). Declaring his innocence, Garrison stated that it was approximately 220 miles from the Pickwick Lake area to Kennett, Missouri (R. 148), which by automobile would require 7 hours for a round trip, and inclement weather on the night of September 7 made flying out of the Corinth area difficult.

The essence of the state's evidence in opposition is that the victim was last known to be alive when she made a telephone call from her Kennett residence at 1:47 a. m. on September 8 (R. 426). At 11:20 a. m., her older daughter, Kimberly, who had spent the night at the nearby home of her grandfather, Dr. Lawrence Wilson, entered the residence and discovered her body in the upstairs master bedroom (R. 115). The child immediately called her grandfather, Dr. Wilson, who came to the scene and moved the body to determine if there was any sign of life before summoning local police (R. 475). Shortly after the noon hour several law enforcement officers, including Sgt. Shelton, Corporals Crawford and Duckworth, and Troopers Cox and Pemberton of the Missouri State Highway Patrol, arrived at the residence and proceeded with their investigation, which continued periodically until after midnight (R. 473). At the officers' request, Dr. Wilson showed them how to place the victim's body in the position in which he had found it (R. 476). Trooper Cox discovered a portion of a surgical glove on the grounds outside the house (R. 406). This glove, which was a size 8 model, was manufactured by the Parke Davis Company and was not a variety available at the local hospitals at Kennett (R. 435, 473). This torn surgical glove, from which four fingers were missing, was later identified to have type O blood on it (R. 481). One glove finger, apparently from the same glove, was said to be found under the victim's body (R. 104–05), but the other three missing glove fingers could not be located, even after a thorough search, anywhere in the house or on the premises (R. 435).

The victim, who had type A blood, appeared to have been savagely beaten; traces of blood were found on the bed and about the bedroom and adjoining bathroom. Smudges of blood were found on the shag carpet in the hallway outside the bedroom, and more bloody traces appeared leading down the stairs which were also carpeted (R. 360–75, 478). It appeared that these

were bloody footprints left by someone walking either barefoot or in sock feet (R. 478). The officers noted that the telephone system, which consisted of three outside lines, with six inside extensions, had been immobilized in a manner which indicated that the intruder was familiar with the house telephone system (R. 117–21, 452). One telephone line, which led to Kimberly's upstairs bedroom, had been pulled loose or cut outside the residence. Phones in the downstairs den and playroom were found off their cradles, thus making the other two lines inoperative. No upstairs telephone had been taken off the hook (R. 451).

The investigating officers determined that the intruder had apparently gained entry by raising a window in the den, but there was no evidence of burglary or rifling of the house contents (R. 87–88, 125–26).

In addition to blood type A found on the victim and in and about her bedroom, traces of type B blood were also found on her leg, as well as downstairs on the inner side of the rear door, out on the patio, and exterior fence (R. 419, 582–97). The investigating officers collected various items of evidence, and attempted unsuccessfully to lift fingerprints from the surgical glove, the telephones, the raised window, and point of entry. Corporal Duckworth, a criminal investigator trained in fingerprint lifting, received the items of evidence from Officers Shelton and Cox upon his arrival at the victim's residence at 3:20 p.m. (R. 391). Duckworth observed smudges of bloody prints leading down the carpeted stairs, where they ended at the landing made of black tile. He did not, on September 8, observe evidence of any footprints on the tile. However, outside the residence his attention was drawn by Corporal Crawford to a chain link fence which bordered the victim's residence, on which there was what appeared to be a "fragmentary fingerprint" (R. 434) left in a dark red substance which appeared to the officer to be blood (R. 347–60, 390–400). Duckworth noted that the "ridges" of the fragmentary print were clearly visible and were standing up in the substance (R. 400). This reddish substance

and the fragmentary print were located on the top rail of the 6-foot high fence, on the south side of Mrs. Garrison's residence. When Duckworth first observed this substance, it was dry and of dull appearance (R. 440). Using fingerprint powder he successfully lifted the print with latent fingerprint tape. This item was placed in a fingerprint card on which Duckworth placed the date and his initials (R. 375). The fingerprint card (Ex. 18) was sent to the state crime laboratory on the following Friday, September 12, together with other materials gathered at the scene, including a sample of the substance taken by Duckworth from scrapings adjacent to the print. This sample was later identified to be type A blood, or the same type as that of the deceased (R. 511, 582–97).

Duckworth, who was without a fingerprint camera, did not photograph the fragmentary print before dusting and lifting it (R. 445). August Nilges, Jr., the state's latent print examiner, identified the fingerprint card submitted to the laboratory by Duckworth, and, upon comparing it with the known fingerprints of Garrison obtained by the F.B.I. on September 9, positively identified the print lifted by Duckworth as that of Garrison's right index finger (R. 511, 531, 541). Nilges found 12 points of similarity between the prints, 3 additional points of apparent likeness, and no points whatever of dissimilarity between the latent print card and Garrison's known print (R. 510). Nilges' opinion was that both prints were made by the same finger (R. 511). Petitioner's fingerprint expert, Sgt. James H. Brandon of the Memphis Police Department, concurred in this opinion (R. 680–83). Although the fingerprint experts differed somewhat in their views as to how long a fingerprint might remain identifiable, Sgt. Brandon testified that in his opinion a bloody print made on a steel fence which was exposed to the elements could not have remained identifiable for 3 months (R. 685–89). Moreover, Corporal Crawford stated that a light rain fell on September 8 soon after the print had been lifted from the fence, and the substance, following the

rain, changed to a darker, maroon color (R. 350).

On the night of September 10, or two days later, Duckworth returned to the residence, at Trooper Pemberton's request. He then saw for the first time, and photographed, a footprint, apparently made by an unshod right foot, which was found at the bottom of the stairway on the black tile, where Duckworth had earlier noticed bloody smudges leading downward from the carpeted stair (R. 370, 392–400, 450). Duckworth acknowledges that he had overlooked this footprint on the 8th "due to it being black tile and the blood was dark" (R. 437). The unusual characteristic which Duckworth noticed about the footprint, and which was disclosed by its photograph (Ex. 19) was that "the toe next to the big toe was not touching the floor" (R. 401). The footprint was made in type A blood (R. 416–20, 582–97). Cathy Richardson, the victim's cousin, testified that a year earlier she and others had noticed that Garrison, while walking barefoot around a friend's swimming pool, had made footprints in which the toe nearest the big toe on the right foot was not visible (R. 597–610). She described this condition of the toe as "it just kind of sets up, it is there but it kind of cocks up off his foot" (R. 598), and she stated that this characteristic had been noted, in Garrison's presence, by his daughter, Lila, as "funny" (R. 600).[15]

Because of the distance from Kennett, Missouri, to Pickwick Lake, the time of death of the victim following the gunshot wound to her head, emerged as a factor in the state habeas hearing. Dr. Pu, Dunklin County pathologist, performed an autopsy at 3 p. m. on September 8, and set forth his physical findings in a written report. Dr. Pu was of the opinion that "allowing for some variation, the time of death was estimated to be between 8 and 9 a. m." (Ex. 1,

R. 130). This opinion was supported by Dr. Van Philpot, a pathologist of Houston, Mississippi (R. 741, 747). However, Dr. Charles Petty, chief medical examiner for Dallas County, Texas, and a specialist in forensic pathology, testified that the autopsy report provided no basis for determining body temperature at the time of death (R. 758), and the gunshot wound, in his opinion, did not cause instant death. Dr. Petty based this view upon the autopsy report which showed a condition of the lungs indicative "the heart rate continued for awhile, and it is not possible to state that the attack took place at the time the death took place" (R. 760). Dr. Petty opined that the time of *death* could range "from 4 to 9 hours after recording the first [rectal] temperature at 1:30 P.M." (R. 760–61). Under this view, the time of death might have occurred as early as 4:30 a. m., with the fatal attack taking place an undetermined amount of time earlier.

The evidence also presented some conflict as to whether gun powder residue, which was allegedly found on the victim's hands, might have occurred as a result of the victim's hands having been placed near the head wound entrance, where gun powder was also present, or whether the victim herself had fired a weapon (R. 620–42). The officers found no weapon or projectile at any place in the bedroom or elsewhere during the course of their investigation.

Garrison reportedly had earlier threatened the victim, according to information given the officers by the victim's family and their attorney (R. 85–86, 105). Petitioner's counsel sought at the state hearing, despite repeated objections by respondent, to suggest the names of other suspects more likely than Garrison to be the guilty party or parties, and offered evidence of Garrison's good character in the Corinth community. As the state trial judge ruled,

---

**15.** Petitioner's counsel vigorously attacks both the authenticity and credibility of the footprint, but it will serve no useful purpose to detail further conflicts as to the probative value of the footprint pointing to Garrison's presence at the residence at the time of the alleged homicide. Physical demonstrations by Dr. Garrison in removing his right shoe and sock at the Mississippi Governor's extradition hearing and in the state court habeas hearing lead to conflicting conclusions (See R. 573–82, 597–610, 690–730).

this proffered evidence was wholly immaterial on the issue of fugitivity.

It is apparent that the state trial habeas judge, when presented with this array of conflicting testimony, was led into error when he stated that the issue of fugitivity "is going to have to be resolved on the basis of the credibility of the testimony" (R. 779). He found credible evidence of alibi irreconcilable with equally credible evidence of the Missouri officers, particularly the fingerprint on the fence lifted by Duckworth. Weighing this conflict, the trial judge, in the language of the Mississippi Supreme Court, "rationalized the presence of [Garrison's] fingerprint by finding, as a matter of fact, that it had been substituted." 329 So.2d at 511. In the words of the trial judge, he concluded "I think somewhere in the five days from September 8th to September 13th, the only reasonable explanation that could be given that I can deduce from all the facts that I have listened to, somebody substituted fingerprints." (R. 783). This attempt to resolve conflicting evidence of a material nature is one of the classic functions of the finder of fact in the courts of the demanding state, and is not to be attempted by the asylum state, especially since the state habeas trial judge had no substantial evidence other than a bare syllogism, upon which to base his "rationalization." Indeed, the conflicts in the evidence were much greater and more substantial than the fingerprint question addressed by the state trial judge.

In addition to the physical evidence linking Garrison to the murder scene, respondent also raised questions bearing on the credibility of petitioner and his crucial alibi witnesses, Ronald Windsor, Linda Sweat and Putt Hamblin. All three admitted being close friends of the petitioner. · Though Garrison's stated purpose for going to Windsor's houseboat the night of September 7 was to get a good night's sleep away from the demands of his patients, he passed up opportunities to stay at an already rented motel room and Windsor's unoccupied housetrailer, choosing instead to sleep on a houseboat where he knew a cookout party would take place. Pam and Mike Miller, the only other people in position to testify to Garrison's nocturnal presence on the boat, did not testify, and the inescapable inference is that neither was aware of his presence on the small craft, though they remained there for several hours. Also significant in this connection is the fact that Sweat and Teralane Veazey placed the Millers' arrival time of the boat at 8 p. m., fully an hour before petitioner and Sweat testified that Garrison retired for the evening. Hamblin, in need of medical attention, drove past a nearby hospital to Pickwick Lake 35 miles away to see petitioner, whose presence there had been made known to him by information that Garrison would be at Windsor's houseboat for a Sunday cookout, scheduled to begin when "everybody got there." Whether Hamblin could have thought the party would begin by 7 a. m. is clearly open to question.

On this record, it is obvious that, in the words of *Bailey,* "[i]t is not possible to say with certainty where the truth lies." 289 U.S. at 419, 53 S.Ct. at 670, 77 L.Ed. at 1296. We thus conclude that Garrison failed to sustain his burden on the issue of proving beyond a reasonable doubt his absence from the State of Missouri at the time of the alleged homicide. Nothing contained herein relates to a determination of his guilt or innocence, since that issue is not before this federal district court.

Let an order denying the petition for writ of habeas corpus, on terms therein prescribed, be issued.